**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**
**Civil Division**

| | |
|---|---|
| DAVID S. SMITH,<br>4407 Argonne Drive<br>Fairfax, VA 22032<br><br>           Plaintiff,<br><br>           v.<br><br>JANET L. YELLEN,<br>SECRETARY, U.S. DEPARTMENT<br>OF THE TREASURY,<br>1500 Pennsylvania Avenue, NW<br>Washington, D.C. 20220<br><br>           Defendant. | Case No. 1:24-cv-2782<br><br><br><br><br><br>JURY TRIAL DEMANDED |

**COMPLAINT**

Plaintiff DAVID S. SMITH, by his undersigned counsel, hereby respectfully complains of Defendant JANET L. YELLEN, in her official capacity as SECRETARY, U.S. DEPARTMENT OF THE TREASURY, as follows:

**PRELIMINARY STATEMENT**

1. As David Smith would explain it, there are two types of law enforcement officers ("LEOs"): there are those who break down doors and arrest people, and then there are the other kind. The federal regulations refer to the breaking-down-doors type as "primary" and the other kind as "secondary." *See* 5 C.F.R. § 842.802. In basic terms, primary LEOs are responsible for investigating, apprehending, or detaining individuals suspected or convicted of criminal offenses, and secondary LEOs perform duties that are supervisory or administrative in nature. Primary LEOs are subject to mandatory retirement at age 60, but secondary LEOs are not.

2. Smith spent much of his career as a primary LEO.  In March 2011, he retired from his position as a Supervisory Special Agent in Charge (a secondary LEO position) with Defendant.  In December 2012, he returned to federal employment as a "reemployed annuitant" when Defendant offered him a one-year appointment as a "Criminal Investigator (Desk Officer)," for the Special Inspector General for the Troubled Asset Relief Program ("SIGTARP"). Although Smith was a LEO, his Desk Officer duties were administrative in nature and did not include investigating, apprehending, or detaining criminals or suspected criminals.

3. Smith received excellent performance reviews, and Defendant renewed his appointment each year until 2020, which was the year he turned 60.  There were two other reemployed annuitants at SIGTARP who turned 60 around that time.  Unlike Smith, those two employees were Special Agents —the breaking-down-doors type of LEOs.  About six months before their birthdays, they received letters from SIGTARP, advising that they were subject to mandatory retirement at age 60.  Smith did not receive such a letter.  In internal emails, SIGTARP supervisors and Human Resources staff agreed that Smith performed administrative duties, held a secondary LEO position, and was not subject to mandatory retirement at age 60.

4. However, on October 10, 2020, just two weeks before Smith's 60th birthday, Sidney Rocke learned that Smith reported him for allegedly sexually harassing a female paralegal.  Rocke was General Counsel to Special Inspector General Christy Goldsmith-Romero.  Three days later, on October 13, 2020, Smith's supervisor unexpectedly advised him that Goldsmith-Romero —who consulted with Rocke about her decision— had decided to separate him from employment.  Goldsmith-Romero claimed that Smith was a primary LEO subject to mandatory retirement at age 60.  Despite Rocke's contention that, absent approval from the

President of the United States, a primary LEO must be separated at age 60 by operation of law, Defendant did not separate Smith until nearly a month after his 60th birthday. Moreover, internal emails and the separation notice Defendant issued merely reflect that Smith's at-will appointment ended, not that he was subject to mandatory retirement based on age.

5. Smith brings this action to recover damages for age discrimination in violation of the Age Discrimination in Employment Act of 1967, as amended, 29 U.S.C. § 621 *et* seq. (the "ADEA"), and for retaliation in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, *et seq*. ("Title VII").

## JURISDICTION AND VENUE

6. This Court maintains jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 29 U.S.C. § 626(c).

7. Venue is proper pursuant to 28 U.S.C. § 1391(b), because Defendant employed Smith in Washington, D.C., and the alleged unlawful acts took place in D.C.

## THE PARTIES

8. Smith is a citizen of the Commonwealth of Virginia. During the relevant time period, Smith was Defendant's employee within the meaning of and entitled to the protections of the ADEA and Title VII.

9. Defendant is named in her official capacity as Secretary of the U.S. Department of the Treasury. At all relevant times, Defendant was Smith's employer within the meaning of and subject to the requirements of the ADEA and Title VII.

## EXHAUSTION OF ADMINISTRATIVE REMEDIES

10. On January 12, 2021, Smith timely filed an administrative complaint of discrimination.

11. Defendant issued a Final Agency Decision ("FAD") on July 3, 2024.

12. Smith timely files this Complaint within 90 days of receiving the FAD on July 3, 2024.

## STATEMENT OF FACTS

*A federal law enforcement officer may be either a primary LEO or a secondary LEO.*

13. Depending on his/her/their "primary duties," a federal law enforcement officer ("LEO") may be either a primary LEO or a secondary LEO. *See* 5 C.F.R. § 842.802.

14. "Primary duties" are "paramount in influence or weight," "[o]ccupy a substantial portion of the individual's working time," and "[a]re assigned on a regular and recurring basis." *Id.*

15. As is relevant here, a primary LEO's primary duties are "the investigation, apprehension, or detention of individuals suspected or convicted of offenses against the criminal laws of the United States, or the protection of officials of the United States against threats to personal safety." *Id.*

16. On the other hand, a secondary LEO position is one that is "clearly in the law enforcement [] field," "in an organization having a law enforcement [] mission," and is either:

    (1) Supervisory; that is, a position whose primary duties are as a first-level supervisor or law enforcement officers [] in rigorous positions; or

    (2) Administrative; that is, an executive, managerial, technical, semiprofessional, or professional position for which experience in a rigorous law enforcement [] position, or equivalent experience outside the Federal Government, is a mandatory prerequisite.

*Id.*

17. Primary LEOs who have not previously retired from Federal service must separate at age 57.

18. In certain circumstances, retired LEOs may return to government service as reemployed annuitants. Even then, reemployed annuitants who hold primary LEO positions must separate at age 60.

19. However, reemployed annuitants who hold secondary LEO positions are not required to

separate at age 60.

### *Defendant designated Criminal Investigator, GS-1811-14, Position Number 09135B, as a secondary LEO position.*

20. On or around February 9, 2009, Defendant sent a letter to the U.S. Office of Personnel Management ("OPM"). In the letter, Defendant advised that it had approved various positions at SIGTARP for law enforcement coverage under the Civil Service Retirement System ("CSRS") and the Federal Employees Retirement System ("FERS").

21. The letter included two tables, the first titled "Primary / Rigorous law enforcement officer positions," and the second titled "Secondary law enforcement officer positions." Defendant listed the position of Criminal Investigator, GS-1811-14, Position Number 09135B, as a secondary LEO position.

### *Smith worked for Defendant as a reemployed annuitant LEO.*

22. Smith was born in November 1960.

23. Smith had a long and distinguished career in law enforcement, ultimately rising to the position of Supervisory Senior Agent in Charge with Defendant.

24. Smith initially retired in March 2011.

25. In or around July 2012, Smith applied for employment with Defendant's Special Inspector General for the Troubled Asset Relief Program ("SIGTARP") as a "Criminal Investigator (Desk Officer)," GS-1811 (hereinafter, "Desk Officer").

26. Defendant's job announcement identified the Desk Officer's duties as assisting and advising senior officials on planning and developing new investigative policies, establishing plans for projects relating to the criminal investigative program, reporting on program weaknesses and identifying corrective action, and advising/assistant U.S. Attorneys in preparing cases. The job announcement also said that the selectee "*[m]ay* be required to perform or lead the

conduct of additional investigative duties." (emphasis added).

27. Smith accepted Defendant's offer for a one-year appointment as a Desk Officer, GS-1811-13, and he began working for SIGTARP as a reemployed annuitant on December 3, 2012.

28. At all relevant times, Defendant was aware of Smith's age because he discussed his age and upcoming 60th birthday with leadership and Human Resources ("HR").

29. Defendant was further aware of Smith's age because of his status as a reemployed annuitant.

30. The following year, effective December 1, 2013, Defendant issued a Notification of Personnel Action, reflecting that Smith was converted to position number 09135S, citing "ADMINISTRATIVE NEED." (emphasis in original).

31. Each year, Defendant renewed Smith's appointment for another year.

32. During the relevant time period, Smith's first-line supervisor was Assistant Deputy Special Inspector General, Investigations ("ADSIG-I"), Norman Embry, and his second-line supervisor was DSIG-I Thomas Jankowski.

33. Smith received outstanding performance ratings and had no disciplinary issues.

***Smith's position description indicated that his "major duties" were administrative.***

34. Per the Desk Officer position description ("PD") for position number 09135S, Smith spent the vast majority of his work hours providing administrative oversight of the case management system ("CMS"); providing administrative assistance to field agents, Special Agents in Charge, and Executive managers; ensuring case files met Council of the Inspectors General on Integrity and Efficiency ("CIGIE") quality standards; assisting with assessing other areas of CIGIE compliance review; and preparing and maintaining reports regarding statistical accomplishments.

35. Smith's major job duties did not include investigating, apprehending, or detaining individuals

suspected or convicted of criminal offenses.

36. Smith's position description indicated that his occupational category, as established by the Equal Employment Opportunity Commission or PATCOB, was Administrative.

### *Smith's Desk Officer duties were vastly different from Special Agent duties.*

37. Smith was one of three SIGTARP employees in the GS-1811 Criminal Investigation series who turned 60 in or around 2020.

38. However, the other two were not Desk Officers like Smith; they were Special Agents who served in the field.

39. Unlike Smith, a field agent's primary duties include, among others: conducting investigations, questioning subjects and witnesses, securing evidence, apprehending and arresting persons violating U.S. laws, and conducting searches and seizures.

### *Defendant decided to treat Smith as a primary LEO without considering the purpose or duties of the Desk Officer position.*

40. In 2014, Christy Goldsmith-Romero, who was the Special Inspector General ("SIG") during the relevant time period, decided that SIGTARP would treat all non-supervisor LEOs, including Smith, as primary LEOs for purposes of mandatory retirement age.

41. In deciding to treat Smith as a primary LEO, Goldsmith-Romero did not review Smith's job announcement, PD, performance plan, performance reviews, or any other documents relating to the purpose or duties of his position.

42. On May 19, 2014, Goldsmith-Romero issued a Management Instruction regarding "Maximum Entry Age and Mandatory Retirement/Separation," MI-ID-OP-2014-01, which imposed a mandatory retirement age for all non-supervisory LEOs "serving in the investigations Division as a primary Law Enforcement Officer."

43. Defendant never notified OPM that it reclassified any secondary LEO positions as primary,

in violation of Defendant's own LEO Certification Procedures. Nor did Defendant reclassify Smith's secondary position as primary, per its internal reporting procedures for Substantive Change to LEO Certifications.

### *Smith reported sexual harassment against a female contractor.*

44. In early January 2020, a female paralegal contractor told Smith that SIGTARP General Counsel Sidney Rocke took her out for drinks in December 2019. The contractor told Smith that Rocke repeatedly asked her to go out with him and made several inappropriate sexual advances towards her. The contractor said she was afraid she would lose her job if she reported the harassment or rejected Rocke's advances.

45. Smith reported Rocke's alleged sexual harassment to HR Specialist Marqueé Washington.

46. On or around January 10, 2020, Washington emailed Vincent Micone, SIGTARP's Deputy Special Inspector General-Management, to inform him about the allegations against Rocke.

47. On January 13, 2020, Micone met with Smith to discuss the allegations of sexual harassment. Smith honestly relayed what the contractor told him about Rocke.

48. Later that day, Micone approached the contractor at her workstation and asked to meet in his office. The contractor asked Micone if she was in any "trouble." Micone assured her that she was not in trouble.

49. Micone met with the contractor alone in his office. Micone indicated that Smith had raised concerns about Rocke sexually harassing her. Micone specifically asked the contractor if "Rocke had done anything that made her feel uncomfortable." Instead of confirming or denying whether Rocke made her feel uncomfortable, the contractor responded that she "had nothing to report and that she enjoyed working at SIGTARP." She further stated that she "did not want to do anything to endanger her employment."

50. Neither Micone, nor anyone else, took any further actions to investigate or otherwise address the allegations that Rocke sexually harassed the contractor.

### *HR indicated Smith was a secondary LEO.*

51. On February 27, 2020, Thomas Jankowski (Smith's second-line supervisor) sent Norman Embry (Smith's first-line supervisor) and HR Specialist Derrick Collier an email with the subject line "Secondary agent role." Jankowski wrote:

> When you have an opportunity, we will need to start the research on this. SA David Smith raised the issue, stating he is in this secondary position as a desk officer, which would exempt him. I don't believe we have anything on this and it is new information…. Please let me know how we should proceed on this.

52. Collier responded to Jankowski: "…I believe this is correct. Our policy states that supervisory and administrative positions are deemed to be 'secondary positions,' this is of course as defined by the SIG. I believe Desk officer positions are administrative…."

### *Embry and Jankowski requested to convert Smith to a secondary LEO.*

53. On September 3, 2020, Marquee Washington emailed Embry and Jankowski, stating: "I spoke with Derrick [Collier] and after evaluation it appears that [Complainant] is in a secondary position. The final determination is made by the head of the agency…."

54. On September 14, 2020, Embry sent Jankowski an email with the subject line "Request to Convert Desk Officer to Secondary Position." The purpose of the email was "to request SIG approval for conversion of ID's "Desk Officer" position to a Secondary Position." In the email, Embry wrote: "[Smith] is not involved in investigating, apprehending, or detaining individuals suspected or convicted of offenses against the criminal laws of the United States. [Smith]'s position is administrative and technical in nature and therefore considered secondary."

55. Jankowski forwarded the email to Micone, who was Principal Deputy SIG at that time, DSIG-Management Melissa Bruce, and Rocke, indicating that he "concur[red]" with Embry's statements.

56. Either later that day or the next day, September 15, 2020, Micone contacted Rocke to ask for advice about whether to allow Smith to continue his employment with SIGTARP. However, neither Micone nor Rocke reviewed Smith's PD or any other documents relating to his duties.

57. Defendant held off on making any decision in September 2020 about whether Smith was required to separate at age 60.

### *Rocke learned that Smith reported him for sexual harassment.*

58. On or around October 10, 2020, shortly after the contractor left her assignment with SIGTARP, Rocke invited the contractor to meet him for coffee and then confronted her about the sexual harassment allegation.

59. Rocke said Micone informed him that someone complained about him attempting to date her, and he asked the contractor if a certain employee was the person who complained about him. The contractor responded that the employee Rocke mentioned did not make the complaint.

60. Based on his conversation with the contractor, Rocke deduced that Smith was the person who reported him for sexual harassment because he knew that Smith was one of about five employees who interacted with the contractor on a daily basis.

### *Three days after Rocke learned that Smith reported him for sexual harassment, Defendant verbally notified Smith of his separation.*

61. On October 13, 2020, just three days after Rocke asked the contractor who reported him for sexual harassment, Embry directed HR to generate a separation notice to send to Smith.

62. On October 14, 2020, Embry called Smith and advised that Goldsmith-Romero had decided not to renew his position.

63. Rocke was Goldsmith-Romero's attorney advisor, and he consulted with her about whether to separate Smith from employment.

64. On October 15, 2020, Micone instructed Bruce and Washington to process Smith's separation effective on the last day of the pay period before his 60th birthday (*i.e.*, October 24, 2020).

65. When Bruce raised concern about giving Smith less than two weeks' notice, Washington responded: "We do have the ability to leave him on past 60 ***because he is in a secondary position,*** it would be similar to what we do with supervisors.  Then we could separate him based on his appointment that it is temporary and serving at the will of the agency." (emphasis added).

66. On October 27, 2020, Defendant provided Smith a letter stating:

    > Pursuant to 5 U.S.C. 3323, a reemployed annuitant of the federal government serves at the will of the appointing authority. This letter serves as official notification of your separation from the Office of the Inspector General for the Troubled Asset Relief Program (SIGTARP) at the end of your appointment. Your separation is effective at the end of the day on Tuesday December 1, 2020.

67. Smith turned 60 years of age on November 2, 2020.  However, Defendant allowed him to continue working until his separation date of December 1, 2020.

68. Defendant processed Smith's separation as a "TERMINATION EXP OF APPT," effective December 1, 2020.

69. In his affidavit dated April 19, 2021, Rocke testified: "Unless they received Presidential authorization, investigators in a primary law enforcement position cannot continue beyond age 60 by operation of law."  (citing 5 U.S.C. § 8425(e); 5 C.F.R. § 842.806(b)).

70. During his deposition on May 20, 2022, Rocke admitted that Defendant did not obtain Presidential authorization to allow Smith to continue working for nearly one month after his 60th birthday.

*Defendant treated Smith less favorably than employees*
*who did not engage in protected EEO activity.*

71. As far as Smith is aware, the two other reemployed annuitants (Special Agents) who turned 60 years of age in 2020 or early 2021 did not engage in protected EEO activity.

72. Although she did not do so for Smith, Defendant provided both Special Agents with six months' advanced written notice of separation.

73. Each of those agents received a separation notice that stated:

   > …Pursuant to SIGTARP's policy on Maximum Entry Age and Mandatory Retirement/Separation MI-ID-OP-014-01, this letter is the advance written notification of your mandatory separation from the Office of the Special Inspector General for the Troubled Asset Relief Program (SIGTARP).
   >
   > MI-ID-OP-014-01 states that a reemployed annuitant law enforcement officer (LEO) is subject to mandatory separation from SIGTARP at age 60. This is effective at the end of the pay period prior to his/her 60th birthday. As a result, your mandatory separation date is….

74. Having received six months' advanced notice, both Special Agents were able to obtain new jobs prior to their mandatory separation dates. They both voluntarily resigned or retired to accept other employment.

75. Having received only about six weeks' advanced notice, Smith was unable to obtain new employment prior to his separation date.

## COUNT 1
### (Discrimination in violation of the ADEA)

76. Smith repeats and realleges paragraphs 1–75, as if fully set forth herein.

77. Defendant terminated Smith's employment based on his age.

78. By and through its conduct, Defendant discriminated against Smith in violation of the ADEA.

79. Defendant's actions were willful, malicious, and in reckless disregard for Smith's rights.

80. As a result, Smith has suffered damages, including but not limited to lost wages and benefits

12

and liquidated damages.

## COUNT 2

### (Retaliation in violation of Title VII)

81. Smith repeats and realleges paragraphs 1–80, as if fully set forth herein.

82. By and through its conduct, Defendant discriminated against Smith in violation of the ADEA.

83. Defendant's actions were willful, malicious, and in reckless disregard for Smith's rights.

84. As a result, Smith has suffered damages, including but not limited to lost wages and benefits and liquidated damages.

### DEMAND FOR JURY TRIAL

Smith demands a jury trial on all Counts so triable.

### PRAYER FOR RELIEF

WHEREFORE, Smith respectfully requests that this Court enter judgment against Defendant on both Counts and award Smith lost wages and benefits, liquidated damages, compensatory damages, pre- and post-judgment interest, an amount equal to the tax on any award, attorney's fees, litigation costs, and any other relief as is just and proper.

Dated: September 30, 2024                    Respectfully submitted,

                                             ALAN LESCHT AND ASSOCIATES, P.C.

                                             /s/ Sara McDonough
                                             Alan Lescht [441691]
                                             Sara McDonough [1022641]
                                             1825 K Street, NW, Suite 750
                                             Washington, DC 20006
                                             Tel (202) 315-1759
                                             Fax (202) 463-6067
                                             alan.lescht@leschtlaw.com

sara.mcdonough@leschtlaw.com
*Counsel for Plaintiff*